UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOS KYRTSOS and
MARGARET KYRTSOS, individually
and on behalf of their minor children,
S.K., G.K., A.K. and N.K., and
ANGELA KYRTSOS,

        Plaintiffs,

v.

LATONYA CASH-CALHOUN,
DANIELLE DYKENS, OFFICER
NICHOLAS SMISCIK, OFFICER
PAUL HART, OFFICER DAVID
ADAMS, all jointly and severally and
in their individual capacities, and
CITY OF SOUTHFIELD, a
municipality, jointly and severally,

        Defendants.

_____/

Case No. 10-cv-12295
Paul D. Borman
United States District Judge

**OPINION AND ORDER**
**(1) GRANTING DEFENDANTS DAVID ADAMS, PAUL HART, AND NICHOLAS SMISCIK'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 73);**
**(2) GRANTING DEFENDANT LATONYA CASH-CALHOUN'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 76);**
**(3) GRANTING DEFENDANT DANIELLE DYKENS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 77); AND**
**<u>(4) DISMISSING THE ACTION</u>**

        Plaintiffs Christos Kyrtsos and Margaret Kyrtsos, along with their minor children, S.K., G.K., A.K., N.K., and Angela Kyrtsos[1] (collectively "Plaintiffs") filed this action on June 10, 2010,

---

[1] Angela Kyrtsos was a minor at the time of the incident at issue, but is now an adult.

alleging 42 U.S.C. § 1983 violations arising under the Fourth and Fourteenth Amendments, civil conspiracy, and gross negligence. (Dkt. No. 1.) Michigan Department of Human Services ("DHS") employees Latonya Cash-Calhoun and Danielle Dykens, as well as Officer Nicholas Smiscik, Officer Paul Hart, Officer David Adams, and the City of Southfield, were named as Defendants. Plaintiffs allege that Defendants unlawfully entered their home and seized their minor children without a warrant or court order.

On February 24, 2011, the Court granted in part Defendants' Adams, Hart, and Smiscik's Motion to Dismiss and dismissed all state law claims against the Defendant officers, but did not dismiss the § 1983 cause of action. (Dkt. No. 38.) Specifically, the Court dismissed the civil conspiracy claims against all Defendants, but did not dismiss the claims for gross negligence against Defendants Cash-Calhoun and Dykens. The Court also dismissed Defendant City of Southfield on March 14, 2011. (Dkt. No. 40.)

On October 26, 2011, Defendant Officers Smiscik, Hart, and Adams, filed a Motion for Summary Judgment. (Dkt. No. 73.) Defendants Cash-Calhoun and Dykens filed separate Motions for Summary Judgment on November 3, 2011. (Dkt. Nos. 76, 77.)

On November 21, 2011, the parties entered into a Stipulated Order to Dismiss Certain Claims, which dismissed all Plaintiffs' claimed damages except for the following:

> those non-economic damages that may have been sustained by Plaintiffs for the period of time, if any, between when the minor Plaintiffs were taken into custody by the Defendants and when the Oakland County Circuit Court issued its written order authorizing the Department of Human Services to take custody of the minor Plaintiffs.

(Stipulated Order 1-2, Dkt. No. 82.)

After entry of the above stipulation, Plaintiffs filed Responses to the Defendants' Motions for Summary Judgment on December 13, 2011. (Dkt. Nos. 85, 86, and 87.) Defendants each filed a Reply on December 27, 2011. (Dkt. Nos. 93, 95 and 96.) The Court held a hearing on February 10, 2012.

For the reasons stated below, the Court will GRANT Defendants' Motions.

## I. BACKGROUND

As noted *supra*, the parties have stipulated to the dismissal of all damages except the alleged non-economic damages arising out of the removal of the minor children prior to the issuance of the Oakland County Circuit Court order authorizing the removal. (Dkt. No. 82.) Plaintiffs also do not dispute that the Oakland County Circuit Court's written order was issued no later than 4:51 p.m. on June 11, 2008. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. B, Faxed Order.) Plaintiffs do not dispute that Defendants arrived at the Kyrtsos home at approximately 3 p.m.

Accordingly, the only issue that remains in dispute is the timing of the removal of the minor children. Plaintiffs argue that the children were removed between 3:50 and 4:15 p.m., and that Defendant Cash-Calhoun called the Oakland County Circuit Court afterward to obtain the court order. Defendants argue that the children were removed sometime between 4:50 and 5:15 p.m., after Defendant Cash-Calhoun had spoken to a juvenile court referee and confirmed that a court order had been issued.

### A. Plaintiffs' Version of Events

Plaintiff Margaret Kyrtsos testified that Defendants arrived at the Kyrtsos home at approximately 3 p.m. on June 11, 2008. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. C, Margaret Kyrtsos Dep. 143-44.) Mrs. Kyrtsos claims that shortly after entering, Defendant Cash-

3

Calhoun "said pack up your kids, I'm taking them." (*Id.* at 96.) Mrs. Kyrtsos further testified that Defendant Cash-Calhoun did not leave the house or make any phone calls, and that she only went outside when she was leaving with the children. (*Id.* 161.) Mrs. Kyrtsos stated that prior to the childrens' exit, she made several phone calls to friends and relatives, but could not find anyone willing or acceptable to take the children. (*Id.* 97.) Mrs. Kyrtsos claimed that Defendant Cash-Calhoun was in the house more than an hour, and eventually left with the children sometime between 4 and 4:15 p.m. (*Id.* at 105, 107.)

In her initial deposition (there were two), Mrs. Kyrtsos based her recollection of Defendants' departure time on: (1) to whom she made phone calls, and (2) on Defendant Cash-Calhoun's statements in her DHS report.

> Q. .... Your testimony earlier today is that you don't have any independent knowledge or recollection of the time at which your children were removed on June 11th, 2008; is that correct?
> A. I told you, actually I told him, that I have phone records and depending upon who I called, which they were very specific, that yes, I can tell you when they were removed.
> Q. Well --
> A. I do not have those records in front of me. I did not look them up before I came here.
> Q. .... My question was: As we sit here right now, do you have independent knowledge of the time at which your children were removed from the home?
> A. I believed that they were removed between 4:00 and 4:15.
> Q. And that's based on what, ma'am?
> A. That's based on who I had talked to and if you want to hear another answer, it's upon what Ms. Calhoun had also written in her report.

(*Id.* at 139-40.) Thus, Mrs. Kyrtsos' testimony relied upon her recollection of her phone records.

At her continued (second) deposition, when the phone records were produced for her

4

recollection, they were inconsistent with Mrs. Kyrtsos's previous testimony. For example, Mrs. Kyrtsos testified that she called her insurance agent at approximately 4:45 p.m. -- after the children were allegedly taken, but before the insurance agency closed at 5 p.m. (Margaret Kyrtsos Dep. 142-43, 200.) However, when the June 11, 2008 phone records were produced, they reflected that a call had been made to the insurance agency at 2:50 p.m., before the Defendants arrived at her house. (*Id.* at 225-26.) Mrs. Kyrtsos admitted that she was mistaken when she stated in her earlier deposition that the call had been made at 4:45 p.m. (*Id.*)

The phone records also showed an outgoing call to Cathy Gontarski, a skating coach at the Dearborn Ice Arena, at 4:40 p.m. (*Id.* at 197.) Mrs. Kyrtsos testified that she contacted Gontarski in attempting to find a suitable home for placement of her children, an option provided by Defendant Cash-Calhoun instead of taking them to Children's Village. (*Id.* 192, 195-96.) This call must necessarily have preceded Plaintiff advising Defendant Cash-Calhoun that Plaintiff could not secure a suitable home placement for the children, thereby necessitating Cash-Calhoun's removing the children to Children's Village.

Further, although Defendant Cash-Calhoun's report, which Mrs. Kyrtsos also relied on for the alleged 4:15 p.m. child-removal time, does indicate that she left the Kyrtsos' home at approximately 4:15 p.m., it states that she did so to call her supervisor to set in motion the procedure to contact the Oakland County Circuit Court to seek an Order to Take [children] Into Custody ("OTTIC"). (Defs.' Hart, Smith and Smiscik Reply Ex. 1, Cash-Calhoun Report.) Thus, this report upon which Mrs. Kyrtsos relied, undermines the basis for Mrs. Kyrtsos' conclusion, and is consistent with Defendant Cash-Calhoun's testimony, discussed *infra*, and with the OTTIC transcript, which states that Defendant Cash-Calhoun contacted the court at 4:34 p.m.

Mrs. Kyrtsos initially testified that the phone records would establish that she called her husband after the children were taken. (*Id.* at 203-04.) The Kyrtsos' phone records, provided to her at the second or continued deposition, establish that Mrs. Kyrtsos called her husband at 3:33 p.m. and 3:49 p.m., and then did not call his office line again until 5:18 p.m. (Def. Cash-Calhoun's Mot. Summ. J. Ex. D, Pl.'s Phone Records 71.) However, Mrs. Kyrtsos claimed, without any specificity, that one of three numbers that she called between 3:54 p.m. to 3:57 p.m. may have been to her husband on a different phone line. (Margaret Kyrtsos Dep. 199.) Based on this inherently incredible testimony in the face of the phone records, Mrs. Kyrtsos testified that the children were possibly taken prior to 4 p.m. (*Id.* at 253-54.)

In contrast to Margaret Kyrtsos's testimony, Angela Kyrtsos stated that she saw Defendant Cash-Calhoun leave the house before taking the children to Children's Village. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. J, Angela Kyrtsos Dep. 169.) Angela Kyrtsos further testified that one of the Defendants did go into a neighbor's yard to make a phone call, although she believed it was Defendant Dykens, not Defendant Cash-Calhoun. (*Id.*)

Plaintiff Angela Kyrtsos also testified that she and the other children were taken from her home between 3:50 and 4:10 p.m. (*Id.* at 171.) Angela Kyrtsos also testified that she saw a clock at Children's Village showing 4:30 p.m. after the children arrived. (*Id.* at 172.) The official intake records at Children's Village establish that the first intake of the Kyrtsos children was at 6:15 p.m. (Def. Cash-Calhoun's Mot. Summ. J. Ex. F, Children's Village Medical Unit Admission.)

Plaintiff Angela Kyrtsos testified that it takes 30 minutes to drive from the Kyrtsos home to Children's Village. (*Id.* at 219.) This would have had them arriving at Children's Village at 4:20-4:30 p.m. She also testified that Defendant Cash-Calhoun did not make a phone call during the drive

to Children's Village. (*Id.* at 236.) But Defendant Cash-Calhoun's phone records indicate that she placed a call at 4:37 p.m., and the OTTIC transcript, in which Defendant Cash-Calhoun testified via phone, states that it began at 4:34 p.m. If the children were removed sometime after the arrival of Defendant Smiscik at 4:06 p.m., then the call to the Oakland County Circuit Court would have been made en route to Children's Village, and Plaintiff Angela Kyrtsos would have observed Defendant Cash-Calhoun call the Oakland County Circuit Court.

Furthermore, Plaintiff A.K.'s deposition testimony reflects that the Kyrtsos children did not eat dinner at the normal dinner time on the day they arrived, which is consistent with an arrival time after 6 p.m.

> Q   When you did go to eat dinner, did you eat all by yourself or were the other kids there?
> A   On the first day?
> Q   Any of the days.
> A   There were kids there for all but the first day.
> Q   So normally all the kids would eat dinner at the same time?
> A   All the guys at one time and all the ladies at another time.
> Q   And your dinner would be what time every day with the guys?
> A   Probably something like 6:00 to 6:30.

(Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. N, A.K. Dep. 145.)

**B. Defendants' Version of Events**

Defendant Cash-Calhoun testified that after she entered the Kyrtsos home and told Margaret Kyrtsos that because Mr. Kyrtsos was living there, the children would have to be removed from the home, Mrs. Kyrtsos began calling many friends and family members who might take the children. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. A, Cash-Calhoun Dep. 53-54.) Cash-Calhoun testified that she could not remember exactly how long she waited while Mrs. Kyrtsos made phone calls, but that she did recall spending "quite some time at the home." (*Id.* at 63.) At approximately

4:30, since Mrs. Kyrtsos was not successful in placing the children at a suitable home, Cash-Calhoun stated that she left the house and went across the street to a neighbor's lawn to call her supervisor, Sherry Stanley, at the DHS office. (*Id.* at 67.) After contacting her supervisor, Cash-Calhoun was either called by or was transferred to a referee at the Oakland County Circuit Court. (*Id.* at 68.) After relaying the case history and her observations of the situation at the Kyrtsos residence to the referee, the referee authorized an OTTIC. (*Id.* at 69-70.) A written OTTIC was faxed to the DHS office at 4:51 p.m. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. B, Faxed Order.)

Defendant Cash-Calhoun's version of events is verified by the official transcript of the June 11, 2008 proceedings that resulted in the Order to Take Into Custody, which establishes the time as 4:34 p.m. (Def. Cash-Calhoun's Mot. Summ. J. Ex. E, OTTIC Transcript 3.) In addition, Cash-Calhoun's cell phone records indicate an outgoing call at 4:37 p.m., approximately the same time that the OTTIC hearing was initiated. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. F, Cash-Calhoun Phone Records.)

Further, the June 11, 2008 official dispatch report of the Southfield Police Department establishes that Defendant Officer Smiscik arrived at the Kyrtsos residence at 4:06 p.m., to relieve a fellow officer whose shift had concluded. (Defs.' Adams, Hart and Smicik's Mot. Summ. J. Ex. I, Dispatch Report, Ex. H, Smiscik Dep. 14.) Officer Smiscik testified that after arriving at the home, he stayed for "a little more than a half an hour" before Defendant Cash-Calhoun informed him and the other officers that they were going to remove the children from the home to Children's Village. (Smiscik Dep. 22.)

Finally, the official intake forms, business records from Children's Village, reflect that the Kyrtsos children arrived at Children's Village at 6:15 p.m. (Def. Cash-Calhoun's Mot. Summ. J.

8

Ex. F, Children's Village Medical Unit Admission.) This timing is corroborated by the official Southfield Police Dispatch Report, which states that transportation to Children's Village was completed by 6:43 p.m. (Dispatch Report.) Officer Smiscik testified that the Defendant officers likely made this entry sometime between dropping off the Plaintiff children at Children's Village and returning to the Southfield Police Department. (Smiscik Dep. 30.)

## II. LEGAL STANDARD

Defendants are entitled to summary judgment when there is no genuine issue as to any material fact. *Spears v. Ruth*, 589 F.3d 249, 253 (6th Cir. 2009). The Court must view all the evidence and construe all reasonable inferences in a light most favorable to the non-moving party. *Id.* Summary judgment is granted "'where the record as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-moving party must therefore show that a disputed fact is "'genuine,' that is, if the evidence is such that a reasonable juror could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. ANALYSIS

Viewing the record as a whole, no reasonable juror could conclude that the Plaintiff minor children were removed from the Kyrtsos home prior to the issuance of a court order. Defendants have produced official business evidence[2] establishing that: (1) Defendant Smiscik did not arrive at the Kyrtsos home until 4:06 p.m., at which time the children were still present in the home; (2)

---

[2]Federal Rule of Evidence 803 provides exceptions to the general rule of inadmissibility of hearsay for: (6) records of regularly conducted business activity, and (8) records and reports of public agencies, except in criminal cases. *See United States v. Lang*, --- F.3d ----, 2012 WL 502698, *7-8 (6th Cir. Feb. 16, 2012).

Defendant Cash-Calhoun contacted the Oakland County Circuit Court for an OTTIC at approximately 4:30 p.m.; (3) the written OTTIC order was issued by 4:51 p.m.; (4) the first of the Kyrtsos minor children was not admitted to Children's Village until 6:15 p.m.; and (5) the Defendant police officers had completed their transport of the Plaintiff minor children by 6:43 p.m. All of this time line is evidenced by official records: the Southfield Police Dispatch Report, the OTTIC court transcript, and the Children's Village intake forms.

Plaintiffs' attempt to establish an alternative earlier time line is based upon inconsistent and contradictory testimony. The phone records that formed the basis for Plaintiffs' claims at Mrs. Kyrtsos' initial deposition, when produced at the second part of Mrs. Kyrtsos' deposition, undercut the basis for her initial testimony. Thus undermined, Plaintiff Margaret Kyrtsos claimed that her children could have been removed as early as 3:50 p.m. However, this conflicts with the Southfield Police Dispatch Report, which reflects that Defendant Officer Smiscik did not arrive at the Kyrtsos home until 4:06 p.m., 16 minutes after Mrs. Kyrtsos claimed her children were removed.

Further, the only reason Mrs. Kyrtsos has given for calling Ms. Gontarski is to arrange for her to take in the Plaintiffs' children. Mrs. Kyrtsos's phone call to Ms. Gontarski at 4:40 p.m. thus undermines her claim that the children had already been removed from the home by 4:15 p.m., since the subsequent court order and removal of the children would have mooted her reason for the Gontarski call.

While the Court does not weigh the evidence on a motion for summary judgment, it must still view "the record as a whole," and determine if "a rational trier of fact [could] find for the non-moving party." *Matsushita*, 475 U.S. at 587. Moreover, a question of fact must be genuine, and sufficient to convince a reasonable juror to "return a verdict for the nonmoving party." *Anderson*,

477 U.S. at 248.

In response to Defendants' motions for summary judgment, Plaintiffs offer only their own contradictory testimony and unreasonable inferences. This is not sufficient to withstand a well-supported motion for summary judgment. *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006) (noting that summary judgment motion does not require a court to draw unreasonable inferences in favor of the nonmovant."). Accordingly, the Defendants' motions are granted.

### IV. CONCLUSION

For the reasons stated above, the Court will:

1) GRANT Defendants Officers Adams, Hart and Smiscik's Motion for Summary Judgment;

2) GRANT Defendant Latonya Cash-Calhoun's Motion for Summary Judgment;

3) GRANT Defendant Danielle Dykens' Motion for Summary Judgment; and

4) DISMISS the case WITH PREJUDICE.

**SO ORDERED.**

_____
PAUL D. BORMAN
UNITED STATES DISTRICT COURT JUDGE

Dated: 3-23-12
Detroit, Michigan